IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ESTATE OF DEVIN KATZFEY,

    Plaintiff,

vs.

                      Case No. 21-cv-385

MICHAEL DITTMAN, SUSAN R. NOVAK, KALEN RUCK, TERRENCE JUDD, LUCAS M. WEBER, HEATHER SCHWENN, DANIEL FRISCH; KELSEY STANGE, PSYCHOLOGIST DOE, JEFFREY NGUYEN, SEAN PRICE, TARA WOODRUFF, LUCAS WOGERNESE, KENNETH CORNELIUS, RODNEY KRATZ, BRADLEY MORGAN, JEFFREY REWEY, MARCI PELOQUIN, CHRISTOPHER OLSON, SAVANAH BERNDT, JASON KOEHN, AUSTIN SCHLACHTER, JOHN GAVINSKI, CHLOE WARE, AND OTHER UNKNOWN EMPLOYEES OF THE STATE OF WISCONSIN,

    Defendants.

## COMPLAINT

### Introduction

1. Devin Katzfey arrived at Columbia Correctional Institution suffering from severe depression and battling thoughts of suicide.

2. Prison officials at Columbia abandoned their obligation to protect Katzfey from hurting himself and instead allowed him to be locked away in segregation under restrictive conditions certain to erode his mental stability and lead him to self-harm.

3. While Katzfey suffered, staff ignored his repeated pleas for mental health care, contact with his family, and other treatment.

4. Less than three weeks after beginning a 180-day sentence to segregation, Katzfey overdosed by swallowing 90 tablets of Tylenol. He survived following a two-night hospital stay.

5. When he returned to the prison from the hospital, officials sent Katzfey to the very same cell in which he'd tried to kill himself.

6. Katzfey again begged for treatment and for relief from the devastating impact on his mental health from the conditions in segregation—in particular, his isolation from family on the outside.

7. Katzfey told prison staff he was contemplating suicide. They did not take him seriously.

8. Less than four months later, Katzfey hanged himself. He was 22 years old when he died.

9. Katzfey's suicide was not an anomaly. It was the product of endemic practices at Columbia—well known to prison supervisors—whereby staff looked at prisoners who harmed themselves with disdain and routinely minimized or ignored requests for help.

10. Though nothing could return Katzfey to his family or provide compensation for the loss of his life, his estate now brings this civil rights lawsuit seeking some measure of redress for the harms he suffered because of the defendants' misconduct.

## Jurisdiction & Venue

11. This court has subject-matter jurisdiction over this case under 28 U.S.C. § 1331 because the Estate's claims arise under federal law.

12. Venue is proper under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claims occurred in this in this judicial district.

## Parties

13. **Plaintiff Estate of Devin Katzfey** is a legal entity with the capacity to sue and act by court-appointed personal representative Natalie L. Smith, who is Devin Katzfey's mother.

14. **Defendant Michael Dittman** was the warden of Columbia Correctional Institution from the time Katzfey arrived at the prison until July 28, 2018.

15. **Defendant Susan R. Novak** was the warden of Columbia Correctional Institution from August 19, 2018 through the time of Katzfey's death.

16. **Defendant Kalen Ruck** was deputy warden at Columbia Correctional Institution at all times relevant to this lawsuit.

17. **Defendant Terrence Judd** was the security supervisor at Columbia Correctional Institution at all times relevant to this lawsuit.

18. **Defendant Lucas M. Weber** was the security director at Columbia Correctional Institution and deputy warden at all times relevant to this lawsuit.

19. **Defendant Heather Schwenn** was a psychologist at Columbia Correctional Institution at all times relevant to this lawsuit.

20. **Defendant Daniel Frisch** was a psychologist at Columbia Correctional Institution at all times relevant to this lawsuit.

21. **Defendant Kelsey Stange** was a psychologist at Columbia Correctional Institution at all times relevant to this lawsuit.

22. **Defendant "Psychologist Doe"** was a psychologist at Columbia Correctional Institution at all times relevant to this lawsuit. His or her name is currently unknown to Plaintiff.

23. **Defendant Jeffrey Nguyen** was a correctional officer at Columbia Correctional Institution at all times relevant to this lawsuit.

24. **Defendant Sean Price** was a correctional officer at Columbia Correctional Institution at all times relevant to this lawsuit.

25. **Defendant Tara Woodruff** was a correctional officer at Columbia Correctional Institution at all times relevant to this lawsuit.

26. **Defendant Rodney Kratz** was a correctional officer at Columbia Correctional Institution at all times relevant to this lawsuit.

27. **Defendant Chloe Ware** was a correctional officer at Columbia Correctional Institution at all times relevant to this lawsuit.

28. **Defendant Bradley Morgan** was a correctional sergeant at Columbia Correctional Institution at all times relevant to this lawsuit.

29. **Defendant Jeffrey Rewey** was a correctional sergeant at Columbia Correctional Institution at all times relevant to this lawsuit.

30. **Defendant Marci Peloquin** was a correctional sergeant at Columbia Correctional Institution at all times relevant to this lawsuit.

31. **Defendant Savanah Berndt** was a correctional sergeant at Columbia Correctional Institution at all times relevant to this lawsuit.

32. **Defendant Jason Koehn** was a correctional sergeant at Columbia Correctional Institution at all times relevant to this lawsuit.

33. **Defendant Austin Schlachter** was a correctional sergeant at Columbia Correctional Institution at all times relevant to this lawsuit.

34. **Defendant John Gavinski** was a correctional sergeant at Columbia Correctional Institution at all times relevant to this lawsuit.

35. **Defendant Lucas Wogernese** was a supervising officer at Columbia Correctional Institution at all times relevant to this lawsuit.

36. **Defendant Kenneth Cornelius** was a supervising officer at Columbia Correctional Institution at all times relevant to this lawsuit.

37. **Defendant Christopher Olson** was a supervising officer at Columbia Correctional Institution at all times relevant to this lawsuit.

## Allegations

### *Katzfey Arrives at Prison In "Very Suicidal" Condition*

38. Devin Katzfey arrived at Dodge Correctional Institution, a Wisconsin Department of Corrections prison, on May 5, 2017. He was 20 years old.

39. Katzfey had a history of abuse, neglect, mental illness, and self-harm.

40. Staff at Dodge immediately recognized that Katzfey was suicidal and needed care and accommodation.

41. The nurse who conducted Katzfey's intake interview recorded that he suffered from a history of bipolar disorder, depression with suicidal ideation, and self-cutting.

42. The nurse also noted that Katzfey had what appeared to be self-inflicted wounds on his arm, thigh, and neck.

43. In addition, at the screening, the nurse wrote that Katzfey was "very depressed" and appeared "very suicidal." The nurse wrote down: "suicidal – high alert."

44. Soon after, Katzfey was referred for placement at the Wisconsin Resource Center, a state-run mental health treatment facility for residents of Wisconsin prisons.

45. Katzfey was referred to the Resource Center because prison staff recognized he posed a very serious self-harm and suicide risk, and because he had tried to kill himself by drinking bleach while at the Milwaukee County Jail a few months earlier.

5

46. At the Resource Center, Katzfey was placed on a special unit that, on information and belief, permitted him to be monitored closely. And he was restricted from having sharp objects or linens.

47. Katzfey responded positively, and his mental health stabilized.

48. Though he told officials that he thought he needed to remain at the Resource Center, the following month, Katzfey was returned to Dodge.

49. He soon returned to the Resource Center for additional care; but was again transferred back to prison, this time to Columbia Correctional Institution, on June 22, 2017.

### *Katzfey Consistently Shows That He's Likely to Commit Suicide*

50. Prison officials at Columbia—including security, medical, and mental health staff—knew Katzfey suffered from mental illness and was at serious risk of suicide if he did not receive appropriate care and accommodation.

51. For starters, Katzfey's written records left no ambiguity about his condition.

52. On information and belief, records reflecting Katzfey's condition, medical care, mental health care, housing assignments, and other information were updated at each facility where he was housed, and they were maintained as a single file that traveled with Katzfey when he transferred to each new facility.

53. Katzfey's prison record was replete with evidence of his suicidal ideation, his need for care, and his ability to respond positively to care and accommodations.

54. Among other things, his record repeatedly documented that:

   a. Katzfey had seriously cut himself several times, including on his arms, thigh, and neck;

 b. He continually re-aggravated the self-inflicted wounds, and they required ongoing medical care including, at times, medication to prevent infection;

 c. He had a history of impulsivity, volatile behavior, and suicide attempts;

 d. He had hidden among his possessions in his prison cell strips of bed linens and t-shirts braided together;

 e. He had saved up a supply of pills given to him by medical staff by only pretending to swallow them as they were given;

 f. He had stabilized while at the Resource Center; and

 g. He thrived from contact with his family and was future-oriented when he was allowed consistent access to the phone.

55. It was also obvious from looking at Katzfey that he was a danger to himself without mental health treatment: his body was covered in wounds in various stages of healing, and scarring from self-inflicted injuries.

### *Katzfey Attempts Suicide In Restrictive Housing*

56. On June 4, 2018, as punishment for a disciplinary infraction, Katzfey was sentenced to serve 180 days in segregation, referred to euphemistically at Columbia as "restrictive housing."

57. Before being sent to segregation but while he was at Columbia, Katzfey had submitted at least twelve written forms reporting he was experiencing mental distress or asking for psychological services and making statements like "I'm depressed, really depressed."

58. Staff at Columbia dismissed Katzfey's requests for help as misbehavior, characterizing him, for example, as "extremely manipulative" and "narcissistic."

7

59. In segregation, Katzfey was locked in his cell almost 24 hours a day. He was almost never permitted to breath fresh air or use the phone.

60. On information and belief, Katzfey's access to visits was restricted while he was in segregation, and he was afforded fewer opportunities to participate in mental health programming and receive mental health care than he would have received in general population.

61. In addition, inmates in segregation were restricted from accessing certain items of personal property including, in Katzfey's case, copies of song lyrics and drawings that he relied on for comfort.

62. Conditions in segregation were also physically unbearable. In July 2018, prisoners at Columbia reported that Warden Dittman ordered all windows in the unit to be locked, creating a stifling environment in which summer temperatures soared in the cell house.

63. On information and belief, Defendants Dittman, Ruck, Judd, Weber, and Psychologist Doe approved Katzfey's sentence to restricted housing despite knowing that the harsh conditions in segregation were likely to destabilize him.

64. They knew this from, among other things, Katzfey's statements, his documented history of self-harm, and reports of harsh conditions in segregation by other inmates.

65. On June 9, 2018, Katzfey submitted a psychological services request form warning: "I'm depressed. I'm losing weight. I'm having trouble eating. And I have no energy." He concluded: "Please talk with me. Thank you."

66. Defendant Frisch received the request and responded by sending Katzfey a "self-help packet list."

67. Frisch scheduled an appointment for Katzfey during the week of June 25, 2018.

8

68. Twelve days later—having received no psychological services in response to his request—Katzfey overdosed by taking 90 500 mg tablets of Tylenol, more than 10 times the maximum safe daily dosage, and a dosage sufficient to cause liver failure and death in some patients, according to the National Capital Poison Center.

69. Around 9:15 p.m., Katzfey collapsed onto the floor, where he was shaking and vomiting.

70. Security staff including officers Jeffrey Nguyen, Sean Price, Tara Woodruff, Lucas Wogernese, Kenneth Cornelius, Rodney Kratz, Bradley Morgan, Jeff Rewey, and Marci Peloquin heard yelling from Katzfey's cellmate to get Katzfey help; and they observed Katzfey lying on the floor of his cell in a semi-conscious state; but they took no action to help Katzfey.

71. After more than two hours, Defendants Cornelius, Kratz, Morgan, Rewey, and Peloquin finally entered Katzfey's cell, where they covered his limp body with a shield, shackled his hands and legs, and moved him by wheelchair to a "restraint chair."

72. Defendant Heather Schwenn was on call in the Psychological Services Unit in the prison at the time and was notified of Katzfey's suicide attempt.

73. Sometime after 11:30 p.m., Katzfey was finally brought to Divine Savior Healthcare, where he was hospitalized for two nights.

74. Defendant Ruck, among other prison officials, was notified of Katzfey's suicide attempt after-the-fact.

75. Defendant Weber approved and signed off on reports documenting the events surrounding Katzfey's overdose.

*Prison Officials Return Katzfey to Identical Conditions and He Completes Suicide*

76. On June 23, 2018, Katzfey was released from the hospital and brought back to

9

Columbia.

77. One day after returning to the prison from the hospital, Schwenn and Judd agreed to release Katzfey from mental health observation, meaning he would not receive regular wellness checks or linen restrictions.

78. Defendant Judd, as the security staff supervisor, and Defendant Schwenn, the psychological services unit supervisor, together approved Katzfey's return *to the very same cell in which he'd just tried to kill himself.*

79. When they did so, Schwenn knew that Katzfey had threatened to harm himself repeatedly while in jail and prison, made good on those threats numerous times, benefited from contact with his family, and struggled greatly to refrain from self-harm while in segregation. She knew this because she was familiar with his medical records, had seen Katzfey numerous times for clinical visits, and was the on-call psychologist when he tried to kill himself just days earlier.

80. Katzfey promptly resumed pleading for help.

81. On July 1, he submitted two written requests asking to see psychology staff and reporting that he was depressed and wanted to talk to his family.

82. Defendant Frisch received one of the requests but did not provide any care in response. Instead, at least five days later, Frisch sent Katzfey a note suggesting Katzfey "try to make a phone call during regular phone call times on the unit" or "try writing to the unit manager [or] social worker."

83. Defendant Stange received the other request, and she also provided no care in response. Stange, like Frisch, replied in writing at least two days later, stating "Hi Mr. Katzfey - PSU [psychological services unit] doesn't arrange phone calls."

84. On July 9, Katzfey submitted another request to see a psychologist. He wrote: "Im

10

severely depressed[.] You told me to write when Im feeling this way. Ive wrote and asked staff to see PSU and no ones helping. I need to see you now!"

85. Dr. Frisch received the request, but he did not schedule an immediate appointment.

86. Having received no care, six days later, Katzfey submitted another request. He wrote: "Im having a hard time coping[.] I need to be seen. Its an emergency. I'm beyond depressed. Listen, I'm beyond depressed. I need to talk to a psychologist NOW."

87. Dr. Frisch saw Katzfey two days later, on July 17, 2018.

88. Katzfey submitted another request for care the next day. He pleaded for phone access to his family and access to his copies of song lyrics and drawings that were taken from him when he was sent to segregation. Katzfey's request concluded: "[C]ome see me before I snap. I feel like your [sic] not taking me seriously."

89. Frisch received the July 18 request. He responded in writing five days later telling Katzfey: "You need to be patient. This is an excellent opportunity to work on developing alternative coping skills. See attached packet."

90. Meanwhile, also on July 18, 2018, Warden Dittman, security director Lucas Weber, and Psychologist Doe[1] approved Katzfey's continued imprisonment in segregation despite knowing from, among other things, Katzfey's statements, medical records, and security

---

[1] A member of the Columbia psychology staff evaluated Katzfey on or around July 17, 2018 in connection with the prison's review of Katzfey's confinement in segregation. The psychologist approved the decision to keep Katzfey in segregation, noting "No current concerns" on the review form. His or her signature on the form, which appears as follows, is illegible:

Plaintiff will serve discovery seeking to identify the psychologist who penned this signature as soon as the court grants leave or the rules permit.

11

records that he was spiraling into crisis and threatening to kill himself.

91. Two days later, on July 20, Katzfey completed another request for psychological services form reporting he was having "severe psychological issues" and had a "history of suicide attempts." He wrote: "I only get this way when I don't get on the phone and talk to my family . . . . I need to get on the phone NOW before I do something that ill regret in hell. Thats a promise."

92. Frisch again received the request, but he did not arrange an appointment or provide any other care.

93. On July 29, 2018, Katzfey sent yet another written request for care. In erratic-looking handwriting, he pleaded to be able to talk with his family on the phone.

94. Again, Frisch received his request, and encouraged Katzfey, in a written response, to work on coping skills. Frisch wrote that he scheduled an appointment to take place some time the week of August 13.

95. Before that appointment, occurred, however, Defendants Ruck, Judd, Weber, and Psychologist Doe reviewed Katzfey's housing assignment and again agreed it was appropriate to keep Katzfey in segregation as a disciplinary measure.

96. These defendants made this decision despite knowing from, among other things, Katzfey's statements, medical records, and security records that he was threatening to kill himself because of his inability to remain in touch with family while in restricted housing.

97. Over the following six weeks, Katzfey's cries for treatment for his grave mental illness fell on deaf ears at the prison.

98. Correctional officers Tara Woodruff, Austin Schachter, Savanah Berndt, Jason Koehn, John Gavinski, and other unknown officers were assigned to Katzfey's cellhouse on the

night of August 31 into the morning of September 1, 2018.

99. They were under the supervision of Defendants Wogernese and Cornelius at the time.

100. On September 1, 2018, shortly before 4 a.m., Devin Katzfey hanged himself in his cell by tying a rope made of bed linen to an air vent in the ceiling.

101. He was pronounced dead at 4:18 a.m.

102. In the two weeks before his suicide, Defendants denied all the inmates on Katzfey's side of the cell house access to the phone, recreation time, and access to the day room, making it impossible for Katzfey to speak to his family.

103. On information and belief, Defendants Woodruff, Schachter, Berndt, Koehn, and Gavinski knew Katzfey was being denied phone access and knew he was likely to harm himself as a result.

104. They knew this because, among other things, Katzfey frequently told prison staff, including these officers, that his inability to connect with his friends and family outside the prison destabilized him and made him feel suicidal.

105. Woodruff, Schachter, Berndt, Koehn, and Gavinski nevertheless failed to take steps to provide Katzfey phone access or mental health treatment.

106. Woodruff in particular was familiar with Katzfey's volatile mental health, having discovered him in distress on the night of his drug overdose just two months earlier.

## Claims for Relief

<u>Count I</u>
Failure to Protect from Self Harm, 42 U.S.C. § 1983
(Seventh Circuit Pattern Jury Instruction No. 7.19)
Against All Defendants

107. The Estate realleges all other allegations here.

108. There was a strong likelihood that Katzfey would seriously harm himself while he was imprisoned at Columbia.

109. Defendants were aware of the strong likelihood that Katzfey would seriously harm himself in the near future.

110. In addition, the risk that Katzfey would be seriously harmed was obvious to Defendants from Katzfey's history, appearance, actions, and words, as described above.

111. Defendants consciously failed to take reasonable measures to prevent Katzfey from seriously harming himself and, ultimately, committing suicide.

112. Defendants were able to take corrective action to prevent Katzfey's suicide.

113. Defendants had no legitimate reasons related to safety or security for failing to take those actions.

114. Katzfey would have suffered less harm, and would have survived, if Defendants had not disregarded the risk he would hurt himself.

115. Defendants acted under color of law.

Count II
Failure to Provide Medical Attention, 42 U.S.C. § 1983
(Seventh Circuit Pattern Jury Instruction No. 7.17)
Against Defendants Schwenn, Frisch, Stange, and Doe

116. The Estate realleges all other allegations here.

117. Katzfey's mental illness was a serious medical need that required treatment.

118. Defendants Schwenn, Frisch, Stange, and Doe were aware that Katzfey had a serious medical need.

119. Katzfey's need for medical care was obvious to Defendants Schwenn, Frisch, Stange, and Doe from his history, appearance, actions, and words, as described above.

120. Defendants consciously failed to take reasonable measures to provide treatment for Katzfey's serious medical need.

Count III
Failure to Intervene under 42 U.S.C. § 1983
(Seventh Circuit Pattern Jury Instruction No. 7.22)
Against All Defendants

121. The Estate realleges all other allegations here.

122. Each Defendant failed to protect Katzfey from the obvious risk that he would seriously harm himself or kill himself at Columbia.

123. Each Defendant knew that medical and security staff at Columbia were failing to protect Katzfey from self-harm.

124. Each Defendant had a realistic opportunity to do something to prevent Katzfey from harming himself.

125. Each Defendant failed to take reasonable steps to prevent Katzfey from harming himself.

126. Defendants' failure to act caused Katzfey to harm himself and, ultimately, to kill himself.

127. Defendants acted under color of law.

Count IV
Liability of a Supervisor under 42 U.S.C. § 1983
(Seventh Circuit Pattern Jury Instruction No. 7.23)
Against Supervisor Defendants

128. The plaintiff realleges all previous allegations here.

129. Columbia correctional officers, including Defendants Nguyen, Price, Woodruff, and Ware, failed to protect Katzfey from harming himself.

130. Dittman, Novak, Ruck, Weber, Judd, Wogernese, Cornelius, Olson, and other unknown supervisors knew that the officers they supervised had a practice of failing to protect Katzfey and others similarly situated from self-harm.

131. These supervisors knew of Katzfey's risk of suicide because they received documentation showing his history of self-harm and need for mental health care, and because Wogernese, Cornelius, and Olson personally witnessed his suicide attempt in June 2018.

132. In addition, these supervisors knew of the risk to Katzfey because there was a pattern of indifference and callousness by Columbia staff directed at mentally ill inmates who engaged in self-harm.

133. Around the time of Katzfey's suicide, inmates at Columbia reported to the Milwaukee Incarcerated Workers Organizing Committee that Columbia staff routinely punished or ignored prisoners reporting suicidal thoughts, or actually encouraged prisoners to proceed with attempting suicide.

134. Columbia prisoners likewise reported that supervisors instructed guards to ignore acts of self-harm and suicidal reports, sometimes leaving wounded prisoners for dead.

135. At best, Dittman, Novak, Ruck, Weber, Judd, Wogernese, Cornelius, Olson, and other unknown supervisors condoned or ignored the practice of ignoring, punishing, or encouraging suicidal prisoners at Columbia. At worst, they approved or assisted in it.

136. As a result, Katzfey committed suicide.

### PRAYER FOR RELIEF

137. The Estate of Devin Katzfey prays for a judgment with the following relief:

   a. Compensatory damages in an amount determined by a jury;

   b. Punitive damages in an amount determined by a jury;

    c. All allowable pre- and post-judgment interest;

    d. Reasonable attorneys' fees and costs;

    e. A declaration that defendants' conduct was unlawful; and

    f. All other relief the court deems just.

## JURY DEMAND

Estate of Devin Katzfey demands a trial by jury under Federal Rule of Civil Procedure 38.

Dated: June 9, 2021            Respectfully submitted,

/s/ Thomas R. Kayes

Thomas R. Kayes, Ill. Bar No. 6315461
LAW OFFICE OF THOMAS R. KAYES, LLC
2045 W. Grand Ave., Ste. B, PMB 62448
Chicago, IL 60612
t. 708.722.2241
tom@kayes.law

Matthew Pinix
State Bar No. 1064368
PINIX LAW, LLC
1200 E. Capitol Dr., Ste. 360
Milwaukee, WI 53211
t. 414.963.6164
f. 414.967.9169
matthew@pinixlaw.com

*Attorneys for Plaintiff*